IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| MATTHEW TIMOTHY BRIGGS, | ) | Case No. 5:18-cv-0889 |
|---|---|---|
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| v. | ) | |
| | ) | |
| COMMISSIONER OF | ) | **MEMORANDUM OF OPINION** |
| SOCIAL SECURITY | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

**I.     Introduction**

Plaintiff, Matthew Timothy Briggs, seeks judicial review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits ("DIB") under Title II of the Social Security Act. The parties consented to my jurisdiction. ECF Doc. 10. Because the ALJ failed to follow proper procedures for the weighing of opinion evidence, the final decision of the Commissioner must be VACATED, and the matter REMANDED for further proceedings consistent with this order.

**II.     Procedural History**

Matthew Briggs applied for DIB on September 3, 2015. (Tr. 142-143). He alleged a disability onset date of March 21, 2014. (Tr. 142). His application was denied initially on December 21, 2015 (Tr. 98-101) and on reconsideration on February 2, 2016. (Tr. 104-106). Briggs requested a hearing and Administrative Law Judge ("ALJ") Louis Alberti heard the case on August 9, 2017. (Tr. 38-57). The ALJ issued a partially favorable decision on September 28,

2017 decision. The ALJ found that Briggs was disabled as of June 5, 2017 (his 50th birthday) based on Medical Vocational Grid 201.14, but not before. (Tr. 11-23). On March 16, 2018, the Appeals Council denied Brigg's request for further review, rendering the ALJ's conclusion the final decision of the Commissioner. (Tr. 1-3). On April 18, 2018, Briggs filed this action to challenge the Commissioner's denial of his claim for the time frame of March 21, 2014 to June 4, 2017. He does not challenge the Commissioner's finding of disability from June 5, 2017 to the present. ECF Docs. 1, 12 at Page ID# 2016.

## III. Evidence

### A. Relevant Medical Evidence

Briggs was born on June 6, 1967 and was 50 years old on the day of his hearing. (Tr. 43). He had past relevant work as a construction laborer. (Tr. 21).

Briggs was driving on March 24, 2014 when he started to feel lightheaded and dizzy. He ran into a guard rail when pulling his car over to the side of the road. He exited the car and began to walk home. On the way, he called his wife who picked him up and took him home. He seemed confused and down and was complaining of abdominal pain, lightheadedness, and continued dizziness. (Tr. 898). Briggs went to the emergency room where he was diagnosed with splenic artery aneurysm, abdominal injuries from motor vehicle accident, chest wall pain and hyperglycemia. (Tr. 900).

While at the hospital, Briggs suffered mid-brain and thalamic strokes. (Tr. 881). A CT scan of the pelvis revealed a large amount of blood within his abdomen and pelvis, a splenetic artery aneurysm, and small filling defect noted in the anterior origin of the innominate artery which was suspicious for a small focal thrombus secondary to the internal injury. (Tr. 921). A CT of the cervical spine revealed mild degenerative disc disease at C3-4 and C4-5 with moderate

changes at C5-6, joint hypertrophy at C4-5 and C5-6, neural foraminal narrowing most pronounced at C5-6, and degenerative spondylosis. (Tr. 922). A CT scan of his chest showed areas of atelectasis seen at both lung bases with small pleural effusions and a rib fracture. (Tr. 894). A CT scan of his brain revealed an acute right thalamic infarction. (Tr. 888). Briggs underwent surgery to remove his spleen and treat the aneurysm and repair torn mesenteric vessels some in the traverse colon. (Tr. 873).

A follow up chest CT scan on April 3, 2014 showed bilateral atelectasis (a common breathing complication after surgery in which one or more areas of your lung collapse or don't inflate properly.) (Tr. 860).

On April 12, 2014, Briggs was at Edwin Shaw for rehab when he became agitated and combative. He was transported to the emergency room with a police officer. At the emergency department, he had delusions and acted violently. He told the nurse that he saw his sister on a bench outside the room, neither of which was there. (Tr. 833). An EEG returned abnormal results suggesting an encephalopathy that could be due to multiple causes. (Tr. 826). Briggs was admitted and treated for anemia due to bleeding, stress leukocytosis, severe malnutrition and depression. (Tr. 814).

On April 15, 2014, Briggs attempted to leave the hospital. He tried to steal two cars and had to be subdued by police. (Tr. 805). He was seen in the emergency room appearing unkempt with paranoid and delusional beliefs. (Tr. 806). He was diagnosed with psychotic disorder most likely organic in nature. He did not feel safe around the hospital staff and felt that people were trying to kill him. (Tr. 805). Briggs was admitted to the hospital for a week and a half. (Tr. 782, 796).

On May 29, 2014, Briggs followed up with Dr. Elliot Davidson for back pain in his lower to mid back area that was stabbing in nature. (Tr. 612). On June 2, 2014, he was treated by Dr. Monica Michel for an abscess on his right lower extremity. (Tr. 609). A CT of Briggs abdomen on July 25, 2014 showed a focal celiac artery aneurysm and aneurysmal dilation of the distal common hepatic artery. (Tr. 771).

Briggs went to the emergency room on September 15, 2014 after having a syncopal episode in his doctor's office. (Tr. 761). He admitted to other syncopal episodes. (Tr. 758). An EEG from September 2014 showed nonspecific slowing. (Tr. 1118). Another abnormal EEG in October 2014 showed the presence of focal lesions. (Tr. 1117).

In October 2014, Briggs followed up at the Center for Neuro and Spine to be cleared to drive. Briggs reported that he had had another episode of loss of consciousness since his MVA. (Tr. 226). Dr. Stefan Dupont did not clear Briggs for driving. He noted that Briggs' judgment and insight were questionable because he kept pressing his desire to start driving despite repeated explanation as to why he should not be doing so. (Tr. 227). On October 10, 2014, a loop monitor was implanted that led to a diagnosis of Ehlers-Danlos syndrome. (Tr. 743, 1037).

Briggs treated for Ehlers-Danlos Syndrome, adjustment disorder, and chronic back pain. (Tr. 583-584). On February 16, 2015, he was given a five-year handicap placard due to his history of stroke. (Tr. 585). On March 23, 2015, a CT scan of Briggs' abdomen showed no abnormalities. (Tr. 710). An MRI from March 23, 2015 showed moderate loss of disc height at L5-S1 and L1-L2 with mild multilevel ventral and lateral endplate osteophyte formation at several levels. (Tr. 256). On May 8, 2015, his physician noted that he had significant impairment in physical, emotional and cognitive abilities. Briggs reported his back pain was

controlled. (Tr. 1581). Another CT of Briggs' abdomen on July 24, 2015 showed a focal celiac artery aneurysm and aneurysmal dilation of the distal common hepatic artery. (Tr. 693).

Briggs was taken to the emergency room on July 30, 2015 after being found lying in the grass, intoxicated, at Blossom Music Center. (Tr. 687). He followed up with his doctor who thought that Briggs' multiple-aneurysms diagnosis had "kind of gotten to him." (Tr. 1144).

Briggs continued to treat for his lower back. Treatment notes from September 2015 indicated back pain, joint swelling, joint pain, and limitation of joint movement. (Tr. 1565).

On November 4, 2015, Briggs underwent another surgery to repair an abdominal incisional hernia from his splenectomy. (Tr. 1670). Briggs returned to the emergency room a day after being discharged due to larger than normal bloody output with much darker blood. (Tr. 1647). He was diagnosed with a post-operative complication. (Tr. 1650).

A CT scan of his abdomen in January 2016 showed findings consistent with his earlier abdominal scans. (Tr. 1636-1637). His Ehlers-Danlos syndrome was stable and his doctor stated that there was "nothing of major concern." (Tr. 1693). Another CT scan of Briggs' abdomen in May 2016 showed similar findings as the January 2016 scan. (Tr. 1743).

In November 2016, Briggs complained to Dr. Davidson of neck and shoulder pain. (Tr. 1782-84). Dr. Davidson ordered a consult with physical therapy, but there is no record that Briggs followed through. (Tr. 1784). An MRI of the cervical spine on November 16, 2016 showed advanced multilevel degenerative disc disease. (Tr. 1935).

Briggs started treated for chronic psoriasis on his lower extremities in January 2017. (Tr. 1770). The psoriasis was causing small draining abscesses on his leg. (Tr. 1775). Briggs admitted to using marijuana daily since he was twelve years old. (Tr. 1770).

5

A CT scan of Briggs' abdomen on May 11, 2017 showed a stable celiac artery aneurysm, hepatic artery aneurysm and mild aneurysmal dilation of the left internal iliac and bilateral external iliac arteries. (Tr. 1912).

Briggs met with Dr. Robert Netzley, a thoracic surgeon, on May 25, 2017. Briggs denied any abdominal pain or shortness of breath. Dr. Netzley reviewed the recent CT scan and noted that Briggs' aneurysmal disease was "very stable." Due to his diagnosis of Ehlers-Danlos syndrome, Briggs believed that he had a short life span and had already outlived his expected 48 years. He expressed an interest in following around the Grateful Dead band in the near future. (Tr. 1903).

### B. Opinion Evidence

#### 1. Treating Physician – Dr. Davidson

##### a. August 2015

On August 10, 2015, Dr. Davidson, Briggs' treating physician, completed a Residual Functional Capacity ("RFC") Form. Dr. Davidson opined that Briggs was limited to lifting 10 pounds total, lifting very little occasionally or frequently, he could only stand/walk for two hours total and for 30 minutes at a time. His ability to sit was not affected by his impairment. Due to his risk of aneurysm he was required to avoid heights, moving machinery and vibration. (Tr. 1142). Dr. Davidson opined that Briggs would be off task 15% throughout an 8-hour work day and would miss more than four days per month due to pain or fatigue. He opined that Briggs could use his hands for work 50% of an 8-hour work day. Dr. Davidson wrote that the medical findings that supported his opinions were Briggs' high risk for aneurysm rupture with lifting or straining, chronic low back pain aggravated by standing, and that Briggs would need to frequently change his positions. (Tr. 1143).

### b.     July 2017

Dr. Davidson completed another medical opinion form related to Briggs physical limitations on July 7, 2017.  (Tr. 1961-1962).  He opined that Briggs could lift up to twenty pounds, but "very little" weight occasionally and "none" frequently.  He opined that Briggs could stand/walk three hours per day and sit four hours per day.  He opined that Briggs could not climb or crawl and could only occasionally perform other postural activities.  (Tr. 1961).  He opined that Briggs could use his hands 60% of the workday.  He opined that Briggs should avoid exposure to dangerous work settings, pulmonary irritants, noise, and vibration.  (Tr. 1962).  He explained that Briggs was easily confused in loud and congested areas.  (Tr. 1961).  He opined that Briggs would miss more than four workdays per month, be off-task over 20% during a workday, would need to lie down for more than two hours during the workday, and take four unscheduled breaks.  Dr. Davidson wrote that Briggs did not have the necessary "training, education, temperament, physical, emotional, and attitudinal characteristics that would make sustained work possible" after his stroke.  (Tr. 1962).  He attributed Briggs' limitations to his aneurysms, his stroke, Ehlers-Danlos syndrome type IV, and degenerative disc disease of the spine and neck.  (Tr. 1961-1962).

Also on July 7, 2017, Dr. Davidson completed a mental functioning questionnaire.  (Tr. 1958-1960).  He noted numerous limitations in almost all areas.  He wrote that Briggs' multiple medical problems including multiple aneurysms did not allow for physical stress and that any type of straining put him at risk for an aneurysm rupture.  (Tr. 1959).

### 2. Consulting Psychologist – Sudhir Dubey – November 2014

Sudhir Dubey, PsyD., examined Briggs on November 12, 2014. (Tr. 212-219). Briggs reported that he was applying for disability at his doctor's recommendation. He reported that his problems were physical in nature and included heart problems, pulmonary problems, memory problems, aneurysms and stroke sequelae. (Tr. 212). Dr. Dubey noted a stable and good mood, normal energy level, no anhedonia, and satisfactory attention and concentration. (Tr. 213-214). Briggs cognitive testing results placed him in the low-average range. (Tr. 217). Dr. Dubey diagnosed a mild neurocognitive disorder due to medical etiology, alcohol use disorder in sustained remission, cannabis use disorder in early remission, opioid use disorder in sustained remission, cocaine use in sustained remission, and other substance use disorder in early remission. (Tr. 218). He opined that Briggs would not be able to maintain persistence and pace to remember, or to carry out multi-step instructions independently. But he opined that Briggs would be able to carry out simple instructions and would not have any issues dealing with co-workers or supervisors. (Tr. 218-219).

### 3. Consulting Psychologist – Gary Sipps – November 2015

Psychologist Garry Sipps examined Briggs on November 17, 2015. (Tr. 1628-1631). Briggs reported that he was a construction worker who was unable to engage in repetitive lifting, or work with equipment that vibrates. He also needed to avoid stress. He reported that his crying spells and depression were improved with medication. (Tr. 1630). He also reported gaining a lot of weight since his accident. Dr. Sipps noted that Briggs had difficulty lowering himself into his seat. Mentally, Briggs was intelligible and coherent with an appropriate mood. He did not display any overt signs of anxiety or paranoid thinking. No intellectual testing was performed, but Dr. Sipps opined that Briggs' responses placed him in the upper end of the

average range for adult intellectual ability. (Tr. 1629-30). Dr. Sipps diagnosed adjustment disorder with mixed anxiety and depressed mood in partial remission with medication and psychoactive substance dependence in reported remission. He opined that Briggs would not have any mental restrictions on his ability to work. (Tr. 1631-1632).

### 4. State Agency Reviewing Physicians

In October 2015, Dr. Sutherland reviewed Briggs' record and opined that he could perform light exertional work with the following limitations: frequent climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; frequent balancing, kneeling and crouching; occasional stooping and crawling; never working at unprotected heights or with moving mechanical parts. (Tr. 67-69).

Abraham Mikolov, M.D., reviewed Briggs' updated records on January 29, 2016 and affirmed Dr. Sutherland's opinions. (Tr. 81-83).

### C. Relevant Testimonial Evidence

#### 1. Briggs' Testimony

Briggs was fifty years old at the time of the hearing. (Tr. 43). Briggs worked as a union construction laborer for 19 years. Prior to that, he was a material handler, did clean up and ran machinery on sites. (Tr. 44).

Briggs testified that he could not work because he was in constant pain. He had back and neck pain and pain that ran down his arm and down his leg. His psoriasis bothered him and he had to wear very light weight pants. He was irritable and had a hard time getting along with people as a result of his stroke. (Tr. 44).

9

Briggs said he could stand or sit for ten to fifteen minutes before he needed to move around. He could lift a maximum of 20 pounds. He had difficulty with memory and maintaining attention or concentration. (Tr. 46).

Briggs lived alone with a small dog. (Tr. 47-48). On a typical day, he would get up around 7:00 a.m., make coffee and watch TV. He would try to clean around his house a little. Then he would take a two-hour nap. He went to bed early between 8:30 and 9:00 p.m. (Tr. 47).

### 2. Testimony of Dr. Bob Mosley, Vocational Expert

Vocational Expert ("VE"), Dr. Bob Mosley, also testified during the hearing. Dr. Mosley considered Briggs' past work to be as a union laborer in the construction industry, which was very heavy, unskilled work. (Tr. 53).

The VE considered an individual of Briggs' age and education with the same past jobs who could perform light work except that he could only frequently climb ramps and stairs; could never climb ladders, ropes or scaffolding; could frequently balance; occasionally stoop; frequently kneel and crouch; and occasionally crawl. He could never work at unprotected heights or with moving mechanical parts, and he was limited to performing simple routine tasks, and could make only simple work-related decisions. (Tr. 53-54). The VE testified that this individual could not perform Briggs' past work, but could work as an inspector and packager, an assembler of plastic hospital products, or an assembler of electrical accessories. (Tr. 54).

When the hypothetical individual was limited to sedentary work, he could no longer perform those jobs. However, he could work as a touch-up screener of printed circuit boards, a final assembler or a lens inserter. There were a significant number of those jobs in the national economy. (Tr. 55).

The VE testified that an individual who was off task 15% of the time in an eight-hour work day or was absent more than three days a month would not be able to perform any job in the local or national economy. (Tr. 55).

## IV. The ALJ's Decision

The ALJ made the following findings relevant to this appeal:

3. Briggs had the following severe impairments: aneurysm aorta (major branches); spine disorders; chronic obstructive pulmonary disease (COPD); cerebral vascular accident (CVA); organic mental disorders. (Tr. 15).

4. Since March 21, 2014, Briggs had the residual functional capacity to perform sedentary work except he could frequently climb ramps and stairs, but could never climb ladders, ropes or scaffolds. He could frequently balance, kneel and crouch; occasionally stoop and crawl; but could never work at unprotected heights or with moving mechanical parts. He was limited to performing simple, routine tasks and making simple work-related decisions. (Tr. 16).

7. Prior to the established disability onset date, Briggs was a younger individual age 45-49. On June 5, 2017, Briggs' age category changed to an individual closely approaching advanced age. (Tr. 21).

10. Prior to June 5, 2017, the date Briggs' age category changed, there were jobs that existed in significant numbers in the national economy that the claimant could perform. (Tr. 22).

11. Beginning on June 5, 2017, there were no jobs that existed in significant numbers in the national economy that Briggs could perform. (Tr. 23).

Based on all his findings, the ALJ determined that Briggs became disabled on June 5, 2017. He found that Briggs was not disabled from his alleged onset date until June 5, 2017. (Tr. 23).

## V. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.*, 348 F.3d 124, 125 (6th Cir. 2003); *Kinsella v. Schweiker*, 708

F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner may not be reversed just because the record contains substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); see also *Her v. Comm'r of Soc. Sec.*, 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." See *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997). This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without risking being second-guessed by a court. *Mullen,* 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

The court also must determine whether the ALJ decided the case using the correct legal standards. If not, reversal is required unless the legal error was harmless. *See e.g. White v. Comm'r of Soc. Sec*. 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [when] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue,* No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010). Requiring an accurate and logical bridge ensures that a claimant will understand the ALJ's reasoning.

In considering a Social Security benefits application, the Social Security Administration must follow a five step sequential analysis: at Step One, the Commissioner asks if the claimant is still performing substantial gainful activity; if not, at Step Two, the Commissioner determines if one or more of the claimant's impairments are "severe;" if they are, at Step Three, the Commissioner analyzes whether the claimant's impairments, singly or in combination, meet or equal a Listing in the Listing of Impairments; if not, at Step Four, the Commissioner determines whether the claimant can still perform his past relevant work; if not, at Step Five, if it is established that claimant can no longer perform her past relevant work, the burden of proof shifts to the agency to determine whether a significant number of other jobs which the claimant can perform exist in the national economy. *See Combs v. Comm'r of Soc. Sec.,* 459 F.3d 640, 643 (6th Cir. 2006); 20 C.F.R. §§404.1520, 416.920. A plaintiff bears the ultimate burden to prove by sufficient evidence that he is entitled to disability benefits. 20 C.F.R. §404.1512(a).

13

B.     **Treating Physician Rule**[1]

Briggs contends that the ALJ erred by failing to evaluate Dr. Davidson's 2015 opinion and by failing to give good reasons for assigning less than controlling weight to Dr. Davidson's 2017 opinion. The administrative regulations implementing the Social Security Act impose standards for weighing medical source evidence. *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011). In making disability determinations, an ALJ must evaluate the opinions of medical sources in accordance with the nature of the work performed by the source. *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 375 (6th Cir. 2013). The treating physician rule requires that "[a]n ALJ [] give the opinion of a treating source controlling weight if he finds the opinion well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(c)(2)) (internal quotation marks omitted).

Even if the ALJ does not give the opinion controlling weight, the treating source opinion is still entitled to significant deference or weight that takes into account the length and frequency of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and whether the treating physician is a specialist. 20 C.F.R. § 416.927(c)(2)-(6). The ALJ is not required to explain how he considered each of these factors but must provide "good reasons" for discounting a treating physician's opinion. 20 C.F.R. § 416.927(c)(2); see also *Cole*, 661 F.3d at 938. ("In addition to balancing the factors to determine what weight to give a treating source opinion denied controlling weight, the agency specifically requires the ALJ to give good reasons for the weight actually assigned.")

---

[1] 20 CFR §§ 416.927 applies to Briggs' claim because it was filed before March 27, 2017.

The ALJ's "good reasons" must be "supported by the evidence in the case record and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting Soc. Sec. Rul. No. 96-2p, 1996 SSR LEXIS 9, *12, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). As the Sixth Circuit has noted,

> [t]he conflicting substantial evidence must consist of more than the medical opinions of the nontreating and nonexamining doctors. Otherwise the treating physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion. Such a rule would turn on its head the regulation's presumption of giving greater weight to the treating sources because the weight of such sources would hinge on their consistency with nontreating, nonexamining sources.

*Id.* at 377.

A failure to follow these procedures "denotes a lack of substantial evidence, even [when] the conclusion of the ALJ may be justified based on the record." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 (6th Cir. 2007). The Sixth Circuit Court of Appeals "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJs that do not comprehensively set forth reasons for the weight assigned." *Cole*, 661 F.3d at 939 (quoting *Hensley v. Astrue*, 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted).

Regarding Dr. Davidson's opinions, the ALJ stated:

> The claimant's primary care physician, Elliott Davidson, MD, completed an assessment of the claimant's work-related physical capabilities in July 2017 (Ex 21F). Dr. Davidson opined that due to the claimant's Erler's-Danlos [*sic*] syndrome with multiple aneurysms, he is limited to lifting and/or carrying 20 pounds no more than occasionally or "very little." He was further limited to standing and/or walking for up to three hours during an eight-hour workday and sitting for four hours due to the degenerative condition of his spine and neck. Dr. Davidson precluded the claimant from climbing and crawling and limited his

15

other postural activities to no more than 60% of the workday. The claimant's work environment was further restricted in all regards, including dangerous work settings, pulmonary irritants, as well as regarding noise and vibration. The physician explained that the claimant is easily confused in loud and congested areas. Dr. Davidson went on to opine that the claimant would miss more than four workdays per month, be off-task over 20% during a workday and would need to lie down for more than two hours during the workday and take four unscheduled breaks as well. Dr. Davidson closed his assessment by noting that, since the claimant's stroke, he does not have the necessary "training, education, temperament, physical, emotional and attitudinal characteristics that would make sustained work possible."

The undersigned assigns only some weight to Dr. Davidson's opinion. The physical limitations regarding lifting and carrying as well as sitting, standing and/or walking are generally supported by the opinion [*sic*] due to the claimant's multiple aneurysms. However, the further extreme limitations opined by the doctor are not warranted or supported by the record. There is nothing to suggest that the claimant has limitations using his hands as there is no discussion or allegation of such difficulties. In addition, the environmental limitations are overstated according to the medical evidence as there is nothing to suggest issue in noise or around vibration. In addition, his breathing difficulties are often noted as no more than mild and he has not sought any specific treatment or required intervention throughout the relevant period. The opined limitations regarding the claimant's need for breaks, lying down, being off-task and missing workdays are also not consistent with Dr. Davidson's own treatment notes nor are they supported by the overall weight of the medical evidence of record. Finally, the undersigned gives no weight to Dr. Davidson's statement regarding his abilities for sustained employment as the doctor based his assessment on matters outside of his expertise, noting training, education, temperament, emotional and attitudes required for work activity. For these reasons, the undersigned only assigns some weight to Dr. Davidsons's opinion. As Dr. Davidson is a treating source, his opinion is potentially entitled to controlling weight due. However, as such opinion is largely not supported by the doctor's own treatment notes nor is it consistent with the overall weight of the record, controlling weight cannot be assigned.

(Tr. 18-19).

The ALJ never mentioned Dr. Davidson's 2015 opinion at all. A failure to consider a medical source opinion is error. And, contrary to the Commissioner's argument, this error was not harmless. The ALJ found that, as of June 5, 2017, Briggs was disabled by direct application of Medical Vocational Rule 201.14. The ALJ then evaluated only the July 7, 2017 opinion from

16

Dr. Davidson, an opinion issued a month after the date on which the ALJ found Briggs to be disabled. He did *not* evaluate Dr. Davidson's opinion from the time period in which he found no disability – the opinion clearly more relevant to his decision to deny in part Briggs' application for benefits and this appeal.

The Commissioner argues that the 2015 opinion of Dr. Davidson was almost identical to his 2017 opinion. But, even if *the opinion* was identical, Briggs' physical *condition* in 2015 was not identical to his condition in 2017. The ALJ cited several records from 2017 showing improved or stable status as of 2017. For example, the ALJ noted that, "in a recent treatment note dated May 2017, the claimant's aneurysmal disease was said to appear 'very stable'." (Tr. 18). He also noted treatment notes from June 2017 indicating improvement of Briggs' psoriasis. (Tr. 18).

Briggs' condition was arguably worse in 2015. In 2014, he suffered a stroke and was diagnosed with Ehlers-Danlos syndrome. (Tr. 881, 743, 1037). His condition started to improve slowly in 2015. But, on May 8, 2015, his physician noted that he still had significant impairment in physical, emotional and cognitive abilities. He was taken to the emergency room multiple times in 2015. (Tr. 687, 1670, 1650). He underwent surgery to repair a hernia from his splenectomy and had to return to the hospital again due to surgical complications. (Tr. 1670, 1650). The ALJ should have compared Dr. Davidson's 2015 opinion with the evidence of Briggs' impairments during the time period of March 21, 2014 through June 5, 2017.

The ALJ found that Briggs was not disabled from the alleged onset date, March 21, 2014, through June 5, 2017. He was required to provide good reasons for assigning less than controlling weight to Briggs' 2015 treating source's opinion – the opinion issued during the relevant time period – not only to the opinion issued after Briggs became disabled. By

17

evaluating the 2017 opinion, and omitting reference to the 2015 opinion, the ALJ failed to build a logical bridge between the evidence and his decision.

The ALJ also failed to cite specific records supporting his finding that Dr. Davidson's 2017 opinion was not consistent with his own treatment records and/or the overall weight of the record. The ALJ was required to do more than make such conclusory statements. He was required to cite sufficiently specific evidence to make clear to any subsequent reviewers the weight given to the treating source's medical opinion and the reasons for that weight. He didn't do this. He didn't cite any of Dr. Davidson's treatment notes or explain how they were inconsistent with his opinions. Nor did he cite any other evidence in support of these findings. As a result, even if the 2015 and 2017 opinions of Dr. Davidson were nearly the same, the Commissioner's harmless error argument would still be unavailing because the ALJ's reasons for discounting the 2017 opinion were insufficient.

Dr. Davidson was Briggs' treating physician and treated him for several years. His opinion was entitled to controlling weight unless it was not supported by medically acceptable clinical and laboratory diagnostic techniques or it was inconsistent with the other substantial evidence. The ALJ failed to provide good reasons for assigning less than controlling weight to Dr. Davidson's 2017 opinion. Therefore, even if the court gave the ALJ the benefit of the doubt and found that he *did* consider the 2015 Davidson opinion (such conclusion arising from the ALJ's boilerplate statement that he gave "careful consideration to the entire record" (Tr. 16)), remand would still be required because he failed to provide good reasons for his treatment of Dr. Davidson's opinions.

### C. Residual Functional Capacity

The RFC is an administrative finding reserved to the Commissioner based on his evaluation of the totality of the record evidence. *See Shepard v. Comm'r of Soc. Sec.,* 705 F. App'x 435, 442 (6th Cir. 2017), citing *Rudd v. Comm'r of Soc. Sec.,* 531 F. App'x 719, 728 (6th Cir. 2013). Briggs argues that the ALJ's RFC determination was not supported by substantial evidence because the ALJ failed to properly evaluate the limitations in the treating physician's opinion. ECF Doc. 12 at Page ID# 2031. The court has already determined that the ALJ failed to properly evaluate the opinions of Dr. Davidson in this case. The ALJ's RFC determination should be consistent with a proper analysis of the opinion evidence. In determining Briggs' RFC, the ALJ is not necessarily required to adopt all of the limitations expressed in Dr. Davidson's opinions. However, he *is* required to provide good reasons for assigning less than controlling weight to Dr. Davidson's opinions. *Gayheart,* 710 F.3d at 376.

### VI. Conclusion

Because the ALJ failed to follow proper procedures for the weighing of opinion evidence, the final decision of the Commissioner is VACATED, and the matter is REMANDED for further proceedings consistent with this order.

IT IS SO ORDERED.

Dated: February 28, 2019

Thomas M. Parker
United States Magistrate Judge